CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
09/17/2026
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

KENNETH DORSEY SLAUGHTER, *et al.*,

Plaintiffs,

v.

AMERICAN HOME CONTRACTORS OF VIRGINIA, LLC, *et al.*,

Defendants.

Civil Action No. 5:25-cv-00117

By: Elizabeth K. Dillon
Chief United States District Judge

**MEMORANDUM OPINION**

Plaintiffs Kenneth Dorsey Slaughter and Elizabeth Ann Smith Slaughter (the Slaughters) brought this action against Defendants American Home Contractors, LLC (AHC) and Tesla, Inc. (Tesla) alleging claims related to the purchase and installation of a Tesla Solar Roof.[1] This matter is before the court on Tesla's partial motion to dismiss, AHC's motion to dismiss, and the Slaughters' motion to remand to state court. (Dkt. Nos. 6, 8, 10.)

## I. BACKGROUND[2]

Plaintiffs Kenneth Dorsey Slaughter and Elizabeth Ann Smith Slaughter (the Slaughters)

[1] In their complaint, the Slaughters name American Home Contractors of Virginia, LLC, a/k/a American Home Contractors, LLC, d/b/a American Home Contractors, Tesla, Inc., and Tesla Energy Operations, Inc. (Compl. ¶¶ 3–4, Dkt. No. 12.) Although an amended complaint has not been filed, one was circulated prior to this action being removed to federal court and the parties agree that American Home Contractors LLC (AHC) and Tesla, Inc. (Tesla) will be the proper defendants. (Pls.' Br. Supp. Mot. to Remand ¶ 24, Dkt. No. 11; AHC Br. Supp. Mot. to Dismiss 1 n.1, Dkt. No. 9; Tesla Br. Supp. Partial Mot. to Dismiss 1 n.1, Dkt. No. 7.) Accordingly, the court only addresses those defendants here. If the parties want to submit an agreed-upon motion regarding the names, they may do so.

[2] The background section is based on allegations in the complaint, which the court treats as true for purposes of ruling on the pending motions, and the contracts with Tesla and AHC attached as exhibits thereto.

own a home in Shenandoah County, Virginia. (Compl. ¶¶ 1–2, 8, Dkt. No. 12.)[3] The Slaughters, who were "early adopters of alternative energy," "own two Tesla motor vehicles and two Tesla Wall Connector Chargers." (*Id.* ¶ 18.) The Slaughters decided to purchase a Tesla Solar Roof "to maximize synergies between the Tesla Powerwalls, the Solar Roof, and the other Tesla products they owned." (*Id.*) The Tesla Solar Roof was to be comprised of photovoltaic tiles (PV tiles), non-PV glass tiles, metal tiles, and solar components. (*Id.* ¶¶ 12, 17.)

On November 2, 2022, Mr. Slaughter signed a Retail Installment Contract with Tesla for the installation of a Tesla Solar Roof and Powerwall Storage to replace his shingle roof. (Compl. ¶ 12; Exh. 1 to Compl. 67–69, Dkt. No. 12.[4]) The Retail Installment Contract provided that Mr. Slaughter agreed "to purchase the Tesla Energy Products [] as described in [the] Tesla Energy Products Purchase & Home Improvement Agreement from Tesla" pursuant to the downpayment and financing terms outlined therein. (Exh. 1 to Compl. 67.) Mr. Slaughter signed the Tesla Energy Products Purchase & Home Improvement Agreement on October 22, 2022.[5] (*Id.* at 79–88.) Throughout this opinion, the court refers to the Retail Installment Contract and the Tesla Energy Products Purchase & Home Improvement Agreement collectively as the Tesla Contract.

The Tesla Contract included installation and materials, including, but not limited to "3570.69 square feet, 21.960 kW" of materials for the Solar Roof and four Powerwalls. (*Id.* at 82.) In terms of payment, the Tesla Contract provided that the principal amount due to Tesla was

[3] The complaint is docketed in CM/ECF as part of the state court record at docket number 12 and can be found on pages 33–66 therein.

[4] In referring to the exhibits the Slaughters filed with the complaint, the court cites the page numbers assigned by CM/ECF to the state court record.

[5] There is a second Tesla Energy Products Purchase & Home Improvement Agreement included in Exhibit 1 to the Complaint which Mr. Slaughter signed on September 27, 2022. (Exh. 1 to Compl. 72–78.) That agreement predates the agreement subsequently signed on October 22, 2022, and quotes a different price than is memorialized in the Retail Installment Contract. The court, therefore, assumes that the October 22, 2022 Tesla Energy Products Purchase & Home Improvement Agreement is the relevant contract.

$149,415.71. (*Id.*; Compl. ¶ 14.) Mr. Slaughter was to remit a downpayment in the amount of $15,341.57 and the remaining balance of $134,074.14 would be financed for 120 months. (Exh. 1 to Compl. 67.)

Relevant here, attached to the Tesla Contract as Exhibit 1 is a document entitled "Cancellation Rights" that provides, in pertinent part:

> Date of Transaction: 10/22/2022 3:22:04 PM +00:00
>
> You may CANCEL this transaction, without any penalty or obligation, within THREE BUSINESS DAYS OR FIVE BUSINESS DAYS (CA CUSTOMER ONLY) from the above date. If you cancel, any property traded in, any payments made by you under the contract or sale and any negotiable instrument executed by you will be returned within TEN DAYS following receipt by the seller (Tesla, Inc.) of your cancellation notice, and any security interest arising out of the transaction will be canceled. . . .

(*Id.* at 84.)

In 2023, Tesla exited the solar roofing market in Virginia. (Compl. ¶ 19.) Thereafter, Tesla "unilaterally cancelled" its contract with the Slaughters and "insisted" that the Slaughters could only purchase a Tesla Solar Roof through Tesla's exclusive certified third-party installer, AHC. (*Id.* ¶¶ 19–20.) The Slaughters allege that, pursuant to an anti-competition agreement with Tesla, AHC's cost in procuring the Solar Roof components was inflated, thereby increasing the cost to consumers like the Slaughters. (*Id.* ¶ 21.) On May 29, 2024, the Slaughters signed a contract with AHC for Tesla Solar Roof products and installation services (May 2024 Agreement). (*Id.* ¶ 24.) Despite calling for one less Powerwall than the Tesla Contract, the May 2024 Agreement quoted $224,464.00 as the total cost of the project, approximately $75,000 higher than under the original Tesla Contract. (*Id.*)

On September 11, 2025, the Slaughters filed a 10-count complaint against Tesla and AHC

in the Circuit Court for Shenandoah County.[6] In Counts 1 through 6, the Slaughters assert various negligence, misrepresentation, breach of contract, and fraud claims against AHC related to the formation and performance of the May 2024 Agreement. (Compl. ¶¶ 59–113.) In Count 7, the Slaughters allege that Tesla violated Virginia antitrust laws by entering into an agreement with AHC whereby the latter would become the exclusive seller and installer of Tesla Solar Roofs in Virginia. (*Id.* ¶¶ 114–21.) Count 8 alleges that Tesla and AHC conspired to monopolize in violation of Virginia antitrust law. (*Id.* ¶¶ 122–28.) Finally, in Counts 9 and 10 the Slaughters contend that AHC and Tesla respectively violated the Virginia Home Solicitation Sales Act by failing to include the requisite notice regarding a buyer's right to cancel in the May 2024 Agreement and Tesla Contract respectively. (*Id.* ¶¶ 129–53.) The Slaughters seek damages against AHC and Tesla as well as an order providing that the Slaughters are not liable to pay the balance owed to AHC.

On October 30, 2025, Tesla and AHC filed a joint notice of removal in this court. (Not. Removal, Dkt. No. 1.) The notice of removal did not sufficiently allege AHC's citizenship, therefore, the court entered an order directing AHC and/or Tesla to show cause as to why the case should not be remanded to state court for lack of subject-matter jurisdiction. (O.S.C., Dkt. No. 22.) Tesla and AHC filed a joint response providing adequate details as to AHC's citizenship on August 24, 2026, (Resp. to O.S.C., Dkt. No. 23), and the court dismissed the order to show cause on August 25, 2026 (Dkt. No. 24). This matter is now before the court on three motions—Tesla's partial motion to dismiss (Dkt. No. 6), AHC's motion to dismiss (Dkt. No. 8), and the Slaughters' motion to remand (Dkt. No. 10).

[6] In the complaint, the Slaughters named the two financial entities with whom they hold a mortgage—Navy Federal Credit Union and State Department Federal Credit Union as interested parties. (Compl. ¶ 5.)

II. ANALYSIS

**A. The Court Has Subject-Matter Jurisdiction Over This Matter and There Is No Evidence That AHC Acted in Bad Faith in Seeking Removal.**

As a threshold matter, the court addresses the Slaughters' motion to remand for lack of subject-matter jurisdiction. Pursuant to 28 U.S.C. § 1441(a),

> any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

When, as here, only state-law claims are pled, the only basis for removal to federal court is diversity-of-citizenship jurisdiction, which requires complete diversity of citizenship among the parties. *Id.* § 1332(a).

The Slaughters contend that remand is mandated for two reasons: (1) there is not complete diversity; therefore, this court lacks subject-matter jurisdiction, and (2) AHC joined Tesla in filing the joint notice of removal in bad faith. (Pls.' Br. Supp. Mot. to Remand ¶¶ 35–60, Dkt. No. 11.)

As to the Slaughters first argument, it is true that a limited liability company's (LLC) citizenship is determined by the citizenship of the members. *Capps v. Newmark S. Region, LLC*, 53 F. 4th 299, 302 (4th Cir. 2022) (citing *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011)). And where an LLC is wholly owned by another LLC, the court must "trace [the LLC's] citizenship through these layered entities." *Id.* The Slaughters, however, base their argument that AHC is a citizen of Virginia on the citizenship of its *registered agent*. (Pls.' Br. Supp. Mot. to Remand ¶ 42.) As AHC points out in its opposition, neither registered agent referenced by the Slaughters is a *member* of AHC. (Affs. of Nicolas Zavala and Vernon McKenzie, Exhs. 1 and 2 to AHC's Resp. to Pls.' Mot. to Remand, Dkt. No. 18.).

Instead, AHC's sole member is Infinity Home Services, LLC (IHS). (Decl. of Chris Sterr, Exh. 2 to Resp. to O.S.C. ¶¶ 3–4.) IHS's sole member is Infinity Home Services Holdco, Inc. (IHSH). (*Id.* ¶ 6.) IHSH is a corporation incorporated under the laws of Delaware and has its principal place of business in Wisconsin. (*Id.* ¶¶ 7–8.) Because a corporation is "deemed to be a citizen of any State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business," 28 U.S.C. § 1332(c)(1), IHSH is a citizen of Delaware and Wisconsin. In turn, IHS—and AHC—are citizens of Delaware and Wisconsin. The Slaughters are citizens of Virginia, and Tesla is a citizen of Delaware and Texas (Pls.' Br. Supp. Mot. to Remand ¶ 35; Tesla's Resp. to Pls.' Mot. to Remand ¶ 3, Dkt. No. 13; AHC's Resp. to Pls.' Mot. to Remand 10), therefore, complete diversity exists.

The Slaughters next argue that this matter should be remanded because AHC joined Tesla in filing the joint notice of removal in bad faith. (Pls.' Br. Supp. Mot. to Remand ¶¶ 46–60.) Because of AHC's alleged bad faith and lack of good reason for joining Tesla's removal, the Slaughters urge the court to award reasonable attorney's fees and costs under 28 U.S.C. § 1447(c). (*Id.*) As best the court can tell, the Slaughters' bad faith argument is based exclusively on the fact that AHC changed its registered agent the same day the proposed amended complaint naming AHC as a defendant was circulated. (*Id.* ¶ 47–48, 52.) The Slaughters' argument is unavailing. First, as discussed *supra*, it is not the registered agent's citizenship that dictates an LLC's citizenship for purposes of 28 U.S.C. § 1332. Rather, an LLC's citizenship is dependent on the citizenship of its *members*. AHC's act of changing its registered agent, therefore, did not "obfuscate the identity of its members[] so that it [could] avoid litigating . . . in state court after the filing of [the] [c]omplaint," as the Slaughters suggest. (*Id.* ¶ 48.) In other words, there is no nexus between AHC's act of changing its registered agent

and its subsequent decision to join in the notice of removal. Accordingly, the court declines to find that AHC acted in bad faith in joining Tesla in the joint notice of removal.

The Slaughters rely on the rationale just rejected—AHC's changing its registered agent—as the basis for their claim that AHC lacked an objectively reasonable basis for seeking removal and that, therefore, attorney's fees are warranted under 28 U.S.C. § 1447(c). (*Id.* ¶¶ 53–59.) Again, as explained *supra*, AHC's registered agent has no bearing on its citizenship as an LLC for diversity of citizenship purposes, therefore the court finds that attorney's fees are not warranted. The Slaughters' motion to remand is denied.

**B. Section 23 of the May 2024 Agreement Constitutes a Mandatory Forum-Selection Clause That Must Be Enforced Pursuant to the Doctrine of *Forum Non Conveniens*.**

The court next addresses AHC's motion to dismiss. (Dkt. No. 8.) AHC contends that Section 23 of the May 2024 Agreement (Forum Selection Clause) is valid and mandatory and, therefore, the court must apply it and dismiss all claims against AHC under the doctrine of *forum non conveniens*. (AHC Br. Supp. Mot. to Dismiss 2.) The Slaughters counter that the May 2024 Agreement contains a choice of law provision directing that Virginia substantive law be applied. (Opp'n to AHC Mot. to Dismiss ¶ 19, Dkt. No. 15.) Accordingly, the Slaughters argue that the court must apply Virginia law in determining whether to dismiss the Slaughters' claims against AHC on the grounds of *forum non conveniens*. (*Id.* ¶ 20.) Further, the Slaughters argue that Virginia law and public policy render enforcement of the Forum Selection Clause improper. (*Id.* ¶¶ 28–57.) Finally, the Slaughters contend that AHC waived its right to challenge venue by including in Section 23 the language "and waive any right to challenge or otherwise object to . . . venue (including, without limitation, any objection based on inconvenient forum grounds)" in the May 2024 Agreement. (*Id.* ¶¶ 58–64 (citing Exh. 2 to Compl. 136, Dkt. No. 12).)

**1. Federal law applies to the determination of whether to give effect to the Forum Selection Clause.**

As an initial matter, the court addresses the issue of what law to apply when determining whether to enforce the Forum Selection Clause. Federal law governs a federal court's "decision whether to give effect to" a forum-selection clause. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 58 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988)); *see also Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010) ("[A] federal court interpreting a forum selection clause must apply federal law in doing so."). This is because, "[a]s an agreement purporting to modify or waive the venue of a federal court, a forum selection clause implicates what is recognized as a procedural matter governed by federal law—the proper venue of the court." *Albemarle Corp.*, 628 F.3d at 650.

The Slaughters contend that Virginia Code § 8.01-262.1(A) governs venue for lawsuits involving construction contracts. They cite *M.C. Construction Corp. v. Gray Co.*, 17 F. Supp. 2d 541 (W.D. Va. 1998),[7] as an example of that statute being applied in federal court. (Opp'n to AHC Mot. to Dismiss ¶¶ 20, 29.)

Virginia Code § 8.01-262.1(A) provides:

> Where a party whose principal place of business is in the Commonwealth enters into a contract on or after July 1, 1997, to design, manage construction of, construct, alter, repair, maintain, move, demolish, or excavate, or supply goods, equipment, or materials for the construction, alteration, repair, maintenance, movement, demolition, or excavation of a building, structure, appurtenance, road, bridge, or tunnel which is physically located in the Commonwealth, any cause of action arising under such contract may be brought in the jurisdiction where the construction project is located, or such other jurisdiction where the venue is proper under the provisions of this chapter. Any provision in the contract

[7] The Slaughters also cite *M.C. Construction* and Virginia Code § 8.01-262 to support their argument that Virginia public policy concerns weigh against enforcing the Forum Selection Clause. (Opp'n to AHC Mot. to Dismiss ¶¶ 33–36.) The court will address those arguments later.

> mandating that such action be brought in a location outside the Commonwealth shall be unenforceable.

This statute was discussed in *M.C. Construction*, but that case is readily distinguishable. There, the court addressed its discretionary power to transfer a case under 28 U.S.C. § 1404(a) in the arbitration context. *M.C. Constr. Corp.*, 17 F. Supp. 2d at 548–49. Relevant here, the *M.C. Construction* court determined whether an arbitration forum-selection clause in the parties' contract allowing the defendant to select either Virginia or Kentucky as the situs for arbitration was enforceable. *Id.* at 546–48. The *M.C. Construction* court concluded that requiring arbitration to occur in Kentucky would offend the public policy of Virginia as set forth in Virginia Code § 8.01-262.1. *Id.* at 546. The Slaughters contend that this means Section 8.01-262.1 prohibits enforcing the Forum Selection Clause. (Opp'n to AHC Mot. to Dismiss ¶¶ 20, 33–35.) Not so.

The *M.C. Construction* court considered this issue only in addressing whether Kentucky or Virginia law applied. *M.C. Constr. Corp.*, 17 F. Supp. 2d at 546. Moreover, the court went on to find that the Federal Arbitration Act preempts Virginia Code § 8.01-262.1 and that, as a result, "the contract provision which allows the defendant to select Kentucky as the site of arbitration should be applied, notwithstanding its conflict with the Virginia statute." *Id.* at 548. The issue here—whether there is a valid and mandatory forum-selection clause that must be applied—is inapposite to the issues addressed in *M.C. Construction*. Accordingly, neither Virginia Code § 8.01-262.1 nor *M.C. Construction* alters the court's conclusion that federal law applies to the determination of whether to enforce the Forum Selection Clause.[8]

---

[8] Even if *M.C. Construction* was persuasive and even if Virginia law applied, it is not clear that Virginia Code § 8.01-262.1(A) would apply. To be sure, that statute only applies "[w]here a party whose principal place of business is in the Commonwealth enters into a contract" for construction services related to property "which is physically located in the Commonwealth[.]" Va. Code § 8.01-262.1(A). According to AHC, its headquarters are in Maryland. (AHC Br. Supp. Mot. to Dismiss 5.) Although AHC performs work in Virginia and is registered as an

**2. The Forum Selection Clause is mandatory.**

Having determined that federal law applies, the court now turns to the question of whether the Forum Selection Clause is mandatory or permissive. Mandatory forum-selection clauses "require litigation to occur in a specified forum" while permissive clauses "permit[] litigation to occur in a specific forum but do[] not bar litigation elsewhere." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470 (4th Cir. 2018). "[M]andatory forum selection clauses enjoy a presumption of enforceability," while permissive clauses do not. *Id.* at 471 (citing *Albemarle Corp.*, 628 F.3d at 650–51)). Forum-selection clauses found to be mandatory include words such as "sole," "only," or "exclusive" when referring to the forum designated therein. *Id.* at 472.

The clause at issue here is mandatory. Indeed, the Forum Selection Clause provides:

> 23. Jurisdiction and Venue. The Parties consent to *exclusive* jurisdiction and venue in the Circuit Court of Putnam County, West Virginia, and expressly waive federal diversity jurisdiction. Further, with respect to any such legal action, the Parties hereby irrevocably consent and submit to personal jurisdiction in West Virginia, and waive any right to challenge or otherwise object to personal jurisdiction or venue (including, without limitation, any objection based on inconvenient forum grounds).

(Exh. 2 to Compl. 136 (emphasis added); AHC Br. Supp. Mot. to Dismiss 2 (emphasis added).) Because the Forum Selection Clause expressly grants "exclusive" venue in a specific court, it is mandatory and it, therefore, enjoys a presumption of enforceability.

**3. The scope of the Forum Selection Clause is unclear.**

Because mandatory forum-selection clauses enjoy a presumption of enforceability, the court considers it prudent to consider the scope of the Forum Selection Clause at this juncture.

---

LLC here, the record before the court does not compel the conclusion that AHC's principal place of business is in Virginia. It is not clear, therefore, that Virginia Code § 8.01-262.1(A) would even apply to the case at bar.

To analyze a forum-selection clause's applicability, courts employ general principles of contract interpretation. *Martin v. Ball*, 326 Fed. App'x 191, 194 (4th Cir. 2009) (citation omitted). Accordingly, the court starts with the language of the applicable provision. *See, e.g.*, *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013); *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013) (quoting *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984) ("The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used . . . .").

Depending on the language, the scope of a forum-selection clause may be narrow, or it may sweep into its ambit a broader range of related claims. For example, forum-selection clauses mandating that claims that "arise out of or in connection with" the agreement be litigated in a particular forum are construed broadly. *Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 677–78 (4th Cir. 2018). As the Fourth Circuit has explained, "[t]he 'in connection with' language broadens the scope of the clause beyond pure contract claims and extends it to 'every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.'" *Id.* at 678 (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)). Here, it is unclear whether the scope of the Forum Selection Clause encompasses claims that are not purely contractual.

In its motion to dismiss, AHC contends—twice—that the Forum Selection Clause provides that "all disputes shall be brought exclusively in the Circuit Court of Putnam County, West Virginia." (AHC Br. Supp. Mot. to Dismiss 2, 4.) Ostensibly, this language may well be broad enough to cover the antitrust claim in Count 8. The problem is that the "all disputes" language is *not* in Section 23 of the May 2024 Agreement. As recited above, and as AHC correctly quotes in the factual background section of its brief, the Forum Selection Clause does

not define precisely which disputes it covers. Indeed, the first sentence of the Forum Selection Clause merely vests the Circuit Court of Putnam County, West Virginia, with "exclusive jurisdiction and venue." (Exh. 2 to Compl. 136; AHC Br. Supp. Mot. to Dismiss 2.) The remainder of the Forum Selection Clause then provides that "with respect to any such legal action," the parties consent to personal jurisdiction in West Virginia. (*Id.*) Simply put, to which "legal action[s]" the Forum Selection Clause applies is unclear.

Turning to the surrounding provisions of the May 2024 Agreement, it is clear that at a minimum, contractual claims fall within the scope of the Forum Selection Clause. For example, the contract provides in paragraph 21 that "[t]o the full extent permitted by applicable law, Customer understands that Customer is not entitled to recover liquidated or consequential damages against Contractor *under this Agreement*, and that Customer's claims against Contractor cannot exceed the value of this Agreement." (*Id.* (emphasis added).) Nothing in the court's review of the May 2024 Agreement, however, compels the conclusion that the Forum Selection Clause must be applied so broadly as to sweep in all claims related to the contract.

Counts 1, 2, 3, 4, 5, 6, and 9 all relate to representations made as the parties were entering into the contract and AHC's subsequent performance under the May 2024 Agreement.[9] (Compl. ¶¶ 59–113, 129–41.) These claims are clearly within the scope of the Forum Selection Clause. Accordingly, as discussed *infra*, because the Slaughters have not met their burden in showing the Forum Selection Clause is unreasonable, dismissal of Counts 1, 2, 3, 4, 5, 6, and 9 is warranted under the doctrine of *forum non conveniens*.

Whether Count 8 is within the scope of the Forum Selection Clause, however, warrants further discussion. In Count 8, the Slaughters allege that Tesla and AHC violated Virginia

[9] Counts 7 and 10 only name Tesla, who is not a party to the May 2024 Agreement and not bound by the Forum Selection Clause.

antitrust law by conspiring to monopolize. (*Id.* ¶¶ 122–28 (citing Va. Code § 59.1-9.6 *et seq.*).) Although this claim may well be *related to* the May 2024 Agreement, AHC has not met its burden of showing that Count 8 is within the scope of the Forum Selection Clause. Because the scope of the Forum Selection Clause was not briefed by either party, the court will allow the parties to submit briefing as to whether the clause should apply to Count 8.

**4. Regarding claims clearly covered by the Forum Selection Clause, the Slaughters have failed to show the clause is unreasonable.**

Having considered the scope of the Forum Selection Clause, the court now must determine whether to enforce the clause as to the claims within its scope. Generally, federal law "directs courts to favor enforcement of" an agreed upon forum-selection clause, "so long as it is not unreasonable." *Albemarle Corp.*, 628 F.3d at 649 (*citing M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). As the Supreme Court has explained, "[w]hen the parties have agreed to a valid forum-selection clause" the case should ordinarily be dismissed under the doctrine of *forum non conveniens* so the case can be refiled in the specified forum. *Atl. Marine Constr. Co., Inc.*, 571 U.S. at 62. "Only under extraordinary circumstances unrelated to the convenience of the parties should" a federal court decline to enforce a valid forum-selection clause. *Id.*

As the Fourth Circuit has explained, a mandatory forum-selection clause is only unreasonable if:

> (1) [its] formation was induced by fraud or overreaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) [its] enforcement would contravene a strong public policy of the forum state.

*Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (citing *Carnival Cruise Lines, Inc. v.*

*Shute*, 499 U.S. 585, 595 (1991)). The party defying a mandatory forum-selection clause "bears the burden of proving why it should not be enforced." *BAE Sys. Tech. Sol. & Servs., Inc.*, 884 F.3d at 471–72. Only when these public-interest factors are shown to "overwhelmingly disfavor" enforcement of a mandatory forum-selection clause should a court deny enforcement. *Atl. Marine Constr. Co., Inc.*, 571 U.S. at 67.

In arguing that dismissal pursuant to the *forum non conveniens* doctrine on the basis of the Forum Selection Clause is improper, the Slaughters raise several public-interest rationales.[10] As alluded to *supra*, the Slaughters contend that Virginia has a strong public policy interest in having claims arising from construction contracts being litigated in the Commonwealth. (Opp'n to AHC Mot. to Dismiss ¶¶ 28–41.) That public policy, the Slaughters' argument continues, is encapsulated in Virginia Code § 8.01-262.1(A). (*Id.* ¶¶ 29–35.) As an initial matter, and as discussed *supra* in note 8, it is unclear that Section 8.01-262.1(A) would even apply because it is not evident from the facts in the record that AHC's principal place of business is, in fact, in Virginia. Even if it was clear that Section 8.01-262.1(A) applied, any interest the Commonwealth has in not allowing construction companies whose principal place of business is in Virginia to force litigation out of state via a forum-selection clause alone does not "overwhelmingly disfavor" enforcement of said clause.[11]

The Slaughters' other arguments are similarly unavailing. Indeed, that AHC apparently does not have an office in West Virginia does not give the court pause. And contrary to the

[10] The Slaughters also raise several private-interest factors such as the forum being "remote," "arbitrary," and "extremely inconvenient." (Opp'n to AHC Mot. to Dismiss ¶¶ 47–49.) As discussed *supra*, because there is a mandatory forum-selection clause, the court does not consider private-interest factors. Accordingly, the court does not address whether the Circuit Court of Putnam County, West Virginia, is a convenient forum for the Slaughters.

[11] Because the court has concluded that it is unclear whether Count 8, which invokes Virginia antitrust law, is within the scope of the Forum Selection Clause, it is unnecessary at this time for the court to consider the Slaughters' policy arguments related to that claim. (*See* Opp'n to AHC Mot. to Dismiss ¶¶ 53–55.)

Slaughters' suggestion that AHC must allege "oppressiveness or vexation to itself" before the court enforces the Forum Selection Clause, it is, as stated *supra*, the Slaughters' burden to evade enforcement. (Opp'n to AHC Mot. to Dismiss ¶ 51 & n.3.) What is more, the Slaughters do not—and cannot—argue that enforcement of the Forum Selection Clause would deprive them of their day in court or a remedy. To be sure, it appears that AHC has already filed a separate lawsuit in the Circuit Court of Putnam County, West Virginia, premised on the Slaughters' alleged failure to pay the balance due on the May 2024 Agreement. *See Am. Home Contractors, LLC v. Slaughter*, No. 3:26-0020, 2026 WL 780730 (S.D. W. Va. Mar. 19, 2026) (granting AHC's motion to remand to state court after the Slaughters removed the action). In such circumstances, the court has little concern that the Slaughters will be able to litigate their claims in West Virginia. In sum, the Forum Selection Clause is not unreasonable.

**5. AHC has not waived enforcement of the Forum Selection Clause.**

In their final attempt to avoid enforcement of the Forum Selection Clause, the Slaughters contend that AHC waived enforcement by the terms of the May 2024 Agreement itself. The Slaughters draw the court's attention to the final sentence of the Forum Selection Clause which provides: "Further, with respect to any such legal action, the Parties hereby irrevocably consent and submit to personal jurisdiction in West Virginia, and waive any right to challenge or otherwise object to personal jurisdiction or venue (including, without limitation, any objection based on inconvenient forum grounds)." (Opp'n to AHC Mot. to Dismiss ¶ 58 (quoting Exh. 2 to Compl. 136).)

According to the Slaughters, the comma after West Virginia renders everything that comes after it an independent clause. (*Id.* ¶ 61.) As such, the Slaughters contend that the terms of the Forum Selection Clause provide that both parties "waive any right to challenge or

otherwise object to personal jurisdiction or venue (including, without limitation, any objection based on inconvenient forum grounds)." (*Id.* (quoting Exh. 2 to Compl. 136).)

The court does not take such a restrictive view. Considering the Forum Selection Clause as a whole, the first sentence sets the jurisdiction and venue for claims within the clause's scope. The second sentence then provides that the parties consent to personal jurisdiction in West Virginia. Having established venue and personal jurisdiction in West Virginia, the final clause then waives the right to challenge what the Forum Selection Clause has just established. Said another way, the clause upon which the Slaughters rely merely waives the right to challenge the agreed-upon venue established in the preceding sentence: the Circuit Court of Putnam County, West Virginia. It does not waive AHC's right to enforce the Forum Selection Clause, or to challenge the selection of a different forum.

Accordingly, because the Forum Selection Clause is mandatory and the Slaughters have not sustained their burden of showing it is unreasonable, the court will dismiss all claims within the clause's scope under the doctrine of *forum non conveniens*. The court, therefore, grants AHC's motion to dismiss with respect to Counts 1, 2, 3, 4, 5, 6, and 9. Because it is unclear whether Count 8 is within the scope of the Forum Selection Clause, the court denies AHC's motion to dismiss with respect to that claim.

### C. The Slaughters Have Failed to State a Claim Against Tesla Under the Virginia Home Solicitation Sales Act.

Finally, the court turns to Tesla's partial motion to dismiss. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to "articulate facts [that], when accepted as true, [] 'show' that the plaintiff has stated a

claim entitling him to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

In applying the plausibility standard, the "court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023) (citation omitted). The court, however, "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

Tesla moves to dismiss Count 10, which alleges that it violated the Virginia Home Solicitation Sales Act (VHSSA), Va. Code § 59.1-21.1 *et seq.*, by failing to include the required "Buyer's Right to Cancel" notice in the Tesla Contract. (Compl. ¶¶ 142–53.) According to Tesla, because the Slaughters fail to allege that Tesla initiated a home solicitation sale within the meaning of the VHSSA, they fail to state a claim. (Tesla Br. Supp. Partial Mot. to Dismiss 4–6, Dkt. No. 7.) The Slaughters counter that, "[b]ecause of Tesla's operating procedures, all of the [Slaughters'] records of negotiation that occurred prior to the signing of the Tesla Contract are unavailable to [them]." (Opp'n to Tesla Partial Mot. to Dismiss ¶ 19, Dkt. No. 17.) Accordingly, the Slaughters contend that "there is no practical way for [them] to accurately even allege when, where and how" the negotiations with Tesla occurred. (*Id.*) The court must, therefore, determine whether the sale underlying the Tesla Contract falls within the ambit of the VHSSA.

The requirements of the VHSSA apply only to sales meeting the definition of a "home solicitation sale" defined as:

> 1. A consumer sale or lease of goods or services in which the seller or a person acting for him engages (i) in a personal solicitation of the sale or lease or (ii) in a solicitation of the sale or lease by telephone or electronic means at any residence other than that of the seller without prior invitation or appointment; and
>
> 2. The buyer's agreement or offer to purchase or lease is there given to the seller or a person acting for him.

Va. Code § 59.1-21.2(A). Pursuant to the VHSSA, a sale meeting this definition must be accompanied by a written agreement that "contains a statement of the buyer's rights and a notice of cancellation." *Id.* § 59.1-21.4(1). Among other things, the statement must "[a]ppear on the front side of the receipt or contract, or immediately above the buyer's signature, in bold face type of a minimum size of ten points under the conspicuous caption: 'BUYER'S RIGHT TO CANCEL.'" *Id.* § 59.1-21.4(2)(a).

It is evident to the court, as both Tesla and the Slaughters suggest, that there is "a dearth of authority applying and interpreting the VHSSA." *Yarney v. Wells Fargo Bank, N.A.*, No. 3:09-cv-00050, 2010 WL 3663182, at *4 (W.D. Va. Sept. 15, 2010); *Theuer v. Norfolk Air Heating & Cooling, Inc.*, No. CL20-5381, 2020 WL 10315410, at *3 (Va. Cir. Ct. Oct. 7, 2020) (internal citations omitted) (explaining that "[t]he precise range and scope of the [VHSSA] have never been affirmatively defined by Virginia courts"). The threshold question before the court—whether the Slaughters have alleged sufficient facts from which the court can infer that the sale at issue constitutes a "home solicitation sale"—is not, however, questionable.

The plain language of the statute makes clear that a "home solicitation sale" requires a solicitation.[12] Va. Code § 59.1-21.2(A)(1). In other words, the Slaughters were required to allege that Tesla solicited them regarding the sale of a Tesla Solar Roof through either: (1) "personal solicitation" or (2) solicitation "by telephone or electronic means . . . without prior invitation or appointment." *Id.* The Slaughters do not allege facts from which the court can infer that Tesla did in fact engage in an act of solicitation. Indeed, the complaint is devoid of any allegations that Tesla initiated negotiations with the Slaughters, let alone in their home.[13]

Notably, in their response to Tesla's partial motion to dismiss, the Slaughters do not argue that there *was* a solicitation. Rather, the Slaughters contend that the Tesla Contract "provides the location where [it] was signed by including the IP address used to e-sign" the contract. (Opp'n to Tesla Partial Mot. to Dismiss ¶ 18.) By this, the Slaughters are presumably alleging that the Tesla Contract was signed in their home. Yet the contract being signed in the consumer's home, by itself, does not turn a sales transaction into a "home solicitation sale" for purposes of the VHSSA. Indeed, as discussed *supra*, a solicitation is needed.

What is more, the Slaughters aver that "Tesla's operating procedures" preclude them from being able to "even allege when, where and how" the pre-signing negotiations occurred. (*Id.*

---

[12] A 1997 official opinion issued by the Attorney General of Virginia sheds light on the intent behind the VHSSA:

> while one purpose of the legislature is to protect the consumer from home solicitations in which he is required to make an immediate decision regarding a product or service he has not contemplated acquiring, another purpose is to protect the consumer from the pressure that a seller may apply once he is in the buyer's residence and the buyer is unable to simply leave or walk away.

Op. Va. Att'y Gen. (Dec. 17, 1997), https://www.oag.state.va.us/files/Opinions/1997/dec9719.pdf [https://perma.cc/ULQ2-6XE5] (citing a 1985 opinion of the Attorney General of Virginia).

[13] The only reference to a solicitation is the Slaughters' conclusory statement that, pursuant to the VHSSA, Tesla was required to include a statement of the Slaughters' rights and a notice of cancellation in the contract. (Compl. ¶ 15.) The court, however, is not required to accept the Slaughters' legal conclusions. *Wag More Dogs, LLC*, 680 F.3d at 365 (citation omitted).

¶ 19.) Even assuming it is true that only Tesla has records of the negotiations that occurred between it and the Slaughters prior to the signing of the Tesla Contract, it strains credulity to conclude that the Slaughters cannot even allege that Tesla engaged in solicitation. To be sure, even without access to Tesla's records of the negotiations, the Slaughters have provided no reason why—as individuals with personal knowledge of the negotiations—they cannot so much as allege an occurrence where Tesla engaged them in an instance of solicitation. As such, the Slaughters have failed to allege that the Tesla Contract falls within the purview of the VHSSA. Whether the Tesla Contract included the notices required by the VHSSA is, therefore, immaterial. Accordingly, the court will grant Tesla's motion to dismiss Count 10.

## III. CONCLUSION

Because AHC is not a citizen of Virginia there is complete diversity among the parties and the court has subject-matter jurisdiction. Further, the Slaughters have not provided persuasive evidence supporting their allegation that AHC acted in bad faith in joining Tesla in seeking removal. Accordingly, the Slaughters' motion to remand (Dkt. No. 10) will be denied.

Further, the May 2024 Agreement between the Slaughters and AHC contains a valid forum-selection clause vesting exclusive venue in the Circuit Court of Putnam County, West Virginia. Because Counts 1, 2, 3, 4, 5, 6, and 9 all pertain to the May 2024 Agreement, AHC's motion to dismiss on the ground of *forum non conveniens* (Dkt. No. 8) will be granted with respect to those claims. It is not clear, however, that the Forum Selection Clause should be applied to Count 8 which alleges that Tesla and AHC conspired to monopolize in violation of Virginia antitrust law. Accordingly, the court directs AHC to provide briefing to the court as to why the Forum Selection Clause should be applied to Count 8 of the complaint not later than

thirty days after entry of this memorandum opinion and corresponding order. The Slaughters will then have fourteen days to file a response.

Finally, the Slaughters have failed to allege that Tesla engaged them in an instance of solicitation so as to bring the Tesla Contract within the purview of the VHSSA. Accordingly, Tesla's partial motion to dismiss Count 10 (Dkt. No. 6) will be granted. A consistent order will be issued.

Entered: September 17, 2026.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge